[Nos. 6830–7–III; 7181–2–III. Division Three. April 8, 1986.]

MICHIGAN NATIONAL BANK, *Respondent,* v. ANNIKKI OLSON, *Individually and as Personal Representative, Appellant.*

*Donald L. Logerwell, Scott G. Warner, David Lieberworth,* and *Logerwell, Farley & Schoonmaker,* for appellant.

*John S. Moore, Jr., Patrick F. Hussey,* and *Velikanje, Moore & Shore,* for respondent.

MUNSON, J.—Annikki Olson appeals a summary judgment, and the denial of her motion to vacate that judgment, claiming: (1) there are genuine issues of material fact concerning whether a charge on a Visa credit card was authorized and whether the Bank's own negligence was the proximate cause of any loss associated with that charge; (2) the court erred in taxing her certain costs associated with discovery depositions; and (3) summary judgment should have been vacated because Michigan National Bank's responses to certain discovery requests of the defendant were inaccurate and misleading. We reverse and remand for trial.

On May 17, 1983, Michigan National Bank filed suit against Mrs. Olson, individually and as personal representative of the estate of Robert C. Olson, her late husband, after its demand for payment on a Visa card account and creditor's claim filed against the estate were rejected.

The suit arose from an August 10, 1982, credit card transaction involving a $52,500 purchase of jewelry and loose gems from Siam Local Gems, Inc., in Bangkok, Thai-

land; the Olsons denied any involvement or knowledge of the transaction. In its amended complaint, the Bank alleged Mr. Olson either was involved in the transaction or permitted another to have possession and use of his Visa card and that person made the purchase.

In 1982, Mr. Olson traveled extensively outside the United States. He made several trips to Bangkok to arrange for the manufacture of western style boots to be exported to the United States. While in Bangkok, he became romantically involved with a Thai nightclub singer, Morokat Janwadee a/k/a Morokat Prodfuang (Morokat).

On September 4, 1982, after learning of Mr. Olson's amorous relationship with Morokat, Mrs. Olson reported the Visa card stolen. She did this after the Visa billing statement evidenced the August 10 charge. The card had a credit limit of $1,000. When she asked her husband about the charge, he denied knowing anything about the transaction.

Although he had recently been to Bangkok, Mr. Olson returned to the United States on August 8 and did not leave the country again until October 1982. Mrs. Olson later examined the charge slip signed at the time of purchase; she did not believe the signature on the slip was her husband's.

After receiving notice of the alleged theft of the card, the Bank turned the matter over to James Barnes, an employee in its fraud investigation department. A review of the telex activity on the Olsons' Visa account indicated several additional requests for authorization had been made after the August 10 transaction; these requests occurred between August 17 and September 1, 1982, originated from Siam Local Gems, totaled $127,300, and were declined by the Bank. The Bank approved the $52,500 charge because the request for authorization was misinterpreted by Bank personnel as $525, which was within the Olsons' credit limit.

On September 20, 1982, Mr. Barnes contacted Mr. Olson in Sunnyside, Washington, by telephone. Mr. Olson allegedly stated the Visa card was not stolen; he had left the

Visa card and another credit card with his girl friend in Bangkok so she could purchase air fare to the United States. However, the only charge on the Olsons' August billing statement was the August 10 transaction at Siam Local Gems. Mr. Olson indicated he was familiar with Siam Local Gems and had previously purchased gems and jewelry there using personal checks and cash.

The two men spoke again the next day. Mr. Olson advised Mr. Barnes that his girl friend, Morokat, had been in the United States between September 3 and 17. She had returned the Visa card to him, and the card was now in his possession. Mr. Olson also stated he did not believe Thongdee Meelarp, owner of Siam Local Gems, was a "shady merchant".

Thereafter, Mr. Barnes turned the matter over to his supervisor, William B. Turk, and the Bank's legal department. Mrs. Olson sued for divorce. Mr. Olson left the United States shortly thereafter and, while in Bangkok, allegedly married Morokat. Mr. Olson returned to this country on December 3, 1982. He sent the Bank a letter dated December 6, 1982, questioning the approval of this charge and returning the card.[1]

---

[1] The letter stated:

"I received notice from you a couple of months ago that there was an approximate $52,000 charge against my Michigan Bankcard 4460-205-795-265. I do not understand how this could be possible, as the maximum credit limit on this card was approximately $1,500.

"It would appear to me that there is some conspiracy between whoever approves these charges and the merchant who received the dollars.

"I left this credit card along with another credit card and clothing in Thailand but have them in my possession and enclosed you will find said credit card.

"It would be very interesting to see who signed the credit card and if that signature matches mine.

"It surprises me that the credit card could be used for a purchase of that amount and without other documentation i.e., passport or other credit cards.

"Please find enclosed a copy from my passport on both the entry and exit from Thailand. I believe that you had told me that the purchase was made after my exit date. What concerns me is who signed the credit card, who approved the credit card purchase, and how the bank could possibly approve a $52,000 charge on a card with a limit of approximately $1,500.

"I will be leaving the country for a few months and you can contact my wife

Mr. Olson died December 24, 1982, in Sunnyside. After learning of Mr. Olson's death, Morokat came to Washington in January 1983. During her stay, she was interviewed by Mr. Turk and James R. Cambridge, legal counsel for the Bank. Later, in response to the defense's request for discovery of statements taken concerning the August 10 transaction, the Bank's local counsel indicated no written statements had been taken and any notes concerning any interview were privileged.

In January 1984, the Bank deposed Mr. Meelarp in Bangkok by authorized commission pursuant to CR 31. In response to written questions, Mr. Meelarp identified Mr. Olson from a photograph; he also indicated Mr. Olson had been in his shop approximately a year and a half ago and had used his Visa card to purchase jewelry and loose gems. Mr. Meelarp identified a copy of the August 10 charge slip as the one used in this transaction; he said he saw Mr. Olson sign it.

Mr. Meelarp further stated the jewelry and loose gems were delivered to Mr. Olson and a friend, although he could not recall the date of delivery or the name of Mr. Olson's friend. He was not asked whether the friend was male or female. None of the questions propounded by the Bank addressed the circumstances surrounding the later requests for authorization between August 17 and September 1, 1982. Mrs. Olson did not submit cross questions when Mr. Meelarp was deposed; her subsequent request to do so was denied.

The Bank moved for summary judgment claiming the affidavits and depositions submitted in support of its motion established the August 10 charge was authorized; *i.e.*, either Mr. Olson was personally involved in the purchase, or he permitted Morokat to have possession and use of the Visa card and she made the purchase. The defense opposed the motion claiming there was a genuine issue of

Annikki Olson at (509) 837-7604.
   "You will notice that this affidavit is notarized."

material fact concerning the alleged authorized use of the card since the identity of the user was disputed. The defense also asserted the Bank was not entitled to judgment as a matter of law because the evidence on file established the $52,500 charge was the result of the Bank's negligence in authorizing the charge beyond the Olsons' credit limit.

The Bank's motion was granted. Following the denial of the defendant's motion for reconsideration, the Bank was awarded $86,205.33, including interest and attorney fees, plus its costs pursuant to RCW 4.84.090. In its cost bill, the Bank claimed expenses associated with depositions of three of its employees taken by Mrs. Olson in Yakima, including their air fare, plus its costs associated with the deposition of Mrs. Olson.

The defense challenged the costs, claiming these and certain other expenses included in the cost bill were not taxable. The motion was granted in part, but not with respect to the deposition expenses mentioned above. Mrs. Olson appealed.

Morokat filed a claim against Mr. Olson's estate. With respect to this separate action, she was deposed by Mrs. Olson's attorney on October 28, 1983. Morokat denied Mr. Olson gave her a credit card prior to coming to Washington in September 1982. She further stated she was not familiar with Siam Local Gems.

Since it was admitted at oral argument before this court that Morokat had denied having possession of the credit card, we choose not to comment on the postjudgment motion other than as necessary to this opinion.

A summary judgment motion under CR 56(c) can be granted only if the pleadings, affidavits, depositions, and admissions on file establish there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

This case arises under 15 U.S.C. § 1643 (1982) of the Truth in Lending Act. Pursuant to subsection (b) of that statute, a card issuer (Bank) has the burden of proving the

use of the credit card was "authorized" in order to enforce full liability against the cardholder for charges made.[2] *Bank of New York–Delaware v. Santarelli,* 128 Misc. 2d 1003, 491 N.Y.S.2d 980, 981–82 (1985); *Cities Serv. Co. v. Pailet,* 452 So. 2d 319, 321 (La. Ct. App. 1984). If the card issuer fails in this burden, liability of the cardholder is limited to $50 regardless of any notification to the card issuer. *Walker Bank & Trust Co. v. Jones,* 672 P.2d 73, 75 (Utah 1983), *cert. denied,* 466 U.S. 937 (1984). However, if the authorized nature of the use is established, the notification provision of 15 U.S.C. § 1643(a) is irrelevant and ineffectual to limit liability. *Walker Bank,* at 75; *Martin v. American Express, Inc.,* 361 So. 2d 597, 599 (Ala. Civ. App. 1978); *Credit Card Serv. Corp. v. FTC,* 495 F.2d 1004 (D.C. Cir. 1974).

Section 1602(o) defines "unauthorized use" as "a use of a credit card by a person other than the cardholder who does not have actual, implied, or apparent authority for such use and from which the cardholder receives no benefit." The Bank asserts the evidence submitted on the summary judgment motion establishes either Mr. Olson made the August 10 charge or he provided Morokat with apparent authority to make the charge by giving her the credit card prior to leaving Bangkok. Generally, in instances where a cardholder voluntarily permits the use of his credit card by another, he is liable for all uses of that card even though a particular charge may not have been contemplated by him. *Martin,* at 599. The Bank also asserts the uncontroverted deposition of Mr. Meelarp establishes the cardholder received the benefits of the use. It further claims the use must have been authorized since Mr. Olson advised Mr. Barnes the card was not stolen; it, likewise, can be inferred

---

[2]Section 1643(b) provides:

"In any action by a card issuer to enforce liability for the use of a credit card, the burden of proof is upon the card issuer to show that the use was authorized or, if the use was unauthorized, then the burden of proof is upon the card issuer to show that the conditions of liability for the unauthorized use of a credit card, as set forth in subsection (a) of this section, have been met."

the card was not lost since it was returned to the Bank.

Here, the identity of the user is in dispute, given the contradictory nature of the evidence. Proof of who used the card is an inherent part of the Bank's burden of proof. *See Santarelli,* 491 N.Y.S.2d 981–82. So is Morokat's possession of the card. Even assuming, as the Bank claims, Mr. Barnes' deposition established Morokat used the card and had apparent authority to do so, summary judgment would still be improper.

As stated in *Felsman v. Kessler,* 2 Wn. App. 493, 496–97, 468 P.2d 691, *review denied,* 78 Wn.2d 994 (1970):

> It is the general rule that once the moving party has filed affidavits controverting the pleadings, the nonmoving party can no longer rely upon his pleadings but must come forth with evidence, as long as it is available, which would justify a trial. *W. G. Platts, Inc. v. Platts,* [73 Wn.2d 434, 438 P.2d 867, 31 A.L.R.3d 1413 (1968)]; *Plaisted v. Tangen,* 72 Wn.2d 259, 432 P.2d 647 (1967); *Reed v. Streib,* 65 Wn.2d 700, 399 P.2d 338 (1965); Barron & Holtzoff, Federal Practice and Procedure § 1235 at 149. However, where material facts averred in an affidavit are particularly within the knowledge of the moving party, it is advisable that the cause proceed to trial in order that the opponent may be allowed to disprove such facts by cross–examination and by the demeanor of the moving party while testifying. *United States v. Logan Co.,* 147 F. Supp. 330 (W.D. Pa. 1957); *Subin v. Goldsmith,* 224 F.2d 753 (2d Cir. 1955). See also *Hudesman v. Foley,* 73 Wn.2d 880, 441 P.2d 532 (1968); *Balise v. Underwood,* 62 Wn.2d 195, 381 P.2d 966 (1963).

Clearly, Mr. Barnes' statements concerning his conversations with Mr. Olson lie within this exception. The same reasoning underlying *Felsman* would apply to Mr. Meelarp's assertion Mr. Olson received the gems. The statement is obviously self–serving and can only be disproved by cross examination. *Felsman,* at 497.

There also remains a genuine issue whether the Bank voluntarily assumed a duty to the Olsons in setting a credit limit on the account and establishing a system for approving charges on that account. Whether that duty was

breached when the Bank approved the $52,500 charge is also an issue of material fact. *See Humble Oil & Ref. Co. v. Waters,* 159 So. 2d 408, 410 (La. Ct. App. 1963); *see also Roth v. Kay,* 35 Wn. App. 1, 4, 664 P.2d 1299, *review denied,* 100 Wn.2d 1026 (1983); *Sado v. Spokane,* 22 Wn. App. 298, 301, 588 P.2d 1231, *review denied,* 92 Wn.2d 1005 (1979). Under these circumstances, summary judgment was improper. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). We, therefore, do not address Mrs. Olson's remaining contentions.

Both parties have requested attorney fees on appeal pursuant to the following contract provision: "I agree to pay . . . any reasonable attorneys' fees incurred in collection of any amount due . . ." That decision shall abide the trial.

The judgment is reversed and the case is remanded for trial.

McINTURFF, A.C.J., and THOMPSON, J., concur.

Reconsideration denied May 16, 1986.

Review denied by Supreme Court July 8, 1986.